In the
**UNITED STATES DISTRICT COURT**
for the **SOUTHERN DISTRICT OF INDIANA**,
INDIANAPOLIS DIVISION

| | |
|---|---|
| **PATRICIA L. FORREST**, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) CAUSE NO. 1:05-cv-1797-SEB-JMS |
| | ) |
| **CORRECTIONS CORPORATION OF AMERICA**, | ) |
| | ) |
| Defendant. | ) |

**E N T R Y**
**on Defendant's Motion for Summary Judgment (doc. no. 38)**

Plaintiff Patricia Forrest alleges that her employer, Defendant Corrections Corporation of America ("CCA"), discriminated against her on the basis of her gender, race, and age, and then retaliated against her when she filed a complaint related to the discrimination with the Equal Employment Opportunity Commission ("EEOC"). CCA denies the allegations and moves for summary judgment on all of Ms. Forrest's claims. Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). For the reasons that follow, CCA's motion is granted.

CCA operates a private correctional facility, the Marion County Jail II ("Jail"), in Indianapolis, Indiana. In September 1999, CCA hired Ms. Forrest as a Licensed Practical Nurse

1

in its Medical Department.  She is a 64-year-old African-American woman.  The Medical Department operates 24 hours each day on three shifts and Ms. Forrest was assigned to the first shift because that was where the opening existed at the time of her hiring.

In January 2005, to prepare for a national accreditation review of the Jail's medical facilities, CCA's Health Services Regional Director, Mary Garner, arranged for a pharmacy technician from another CCA facility to visit the Jail and reorganize its pharmacy.  Ms. Garner, also an African-American woman, was the third level of supervision above Ms. Forrest:  Ms. Forrest's immediate supervisor, Ms. Jumper, reported to Carmen Copley, who oversaw the Medical Department, and Ms. Copley reported to Ms. Garner.  The day after the technician completed the pharmacy reorganization and departed from the Jail, and while Ms. Gardner was present at the Jail, Ms. Forrest began to rearrange the overstock medication in the pharmacy.  When informed that Ms. Forrest was making these changes, Ms. Garner instructed Ms. Forrest to return the medications to their original order.  Ms. Forrest complied and received no oral or written discipline for the incident.

One month later, in February 2005, CCA created a new nurse duty assignment for a "Pharmacy Technician" on the first shift.  The assignment carried no additional pay or benefits but was considered by management to be one of the many duties to which the nurses generally were assigned.  Ms. Forrest applied for the position,[1] but the assignment was given to a nurse from the second shift, a younger, Caucasian male who had been hired after Ms. Forrest.  Ms.

---

[1] Actually, neither side submitted information showing whether CCA opened the assignment for applications, whether and how it advertised the position, or whether Ms. Forrest formally applied for it or only expressed her interest in receiving the assignment.  We assume for the purpose of the present motion that she formally applied for the assignment.

Garner and Ms. Copley, a white female, made the assignment decision.

There were tensions among the three shifts of nurses. Some members of each shift felt and expressed their feelings that in terms of the workload the other shifts were not pulling their proper weight and there might have been some degree of a racial component to the tensions as well. Some first-shift nurses, most of whom were African-American, used signals to remind each other not to complain so much about the other shifts. These signals took the form of putting a finger over one's mouth and "shushing" another nurse who was complaining. Another signal was "sing[ing] an old Negro spiritual" that had a reference to "hush hush." On May 11, 2005, Ms. Garner called a meeting of all of the nurses, from all shifts, primarily to announce her decision to institute a change to the work shifts.[2] Where previously nurses were permanently assigned to one of three shifts, Ms. Garner decided that all nurses would be rotated among the three shifts on a monthly basis. In addition, Ms. Garner decided to mix the roster of nurses on each shift. Therefore, of the nurses previously on the first shift, approximately half changed shifts for the first month. Of the seven or eight nurses on the first shift, including Ms. Forrest, all but one were African-American.

On May 27, 2005, Ms. Forrest filed her first complaint with the EEOC alleging discrimination based on her failure to receive the assignment as pharmacy technician and the loss of her permanent assignment to the first shift.

In July 2005, while she was home on vacation, Ms. Forrest received a telephone call from

---

[2] CCA alleged that Ms. Garner decided on this change in part to deal with tensions between the shifts and cliques that had developed among the nurses, and to broaden the work experiences of the nurses.

another Jail nurse relating her suspicions that a third Jail nurse, Ms. Gonzalez, had used the wrong type of syringe for an injection. The caller reported to Ms. Forrest that Ms. Gonzalez had asked Ms. Copley, the Medical Department supervisor, about the matter and that Ms. Copley approved the use of the syringe. Ms. Forrest then called a retail drug-store pharmacist and a fourth Jail nurse to inquire about the appropriateness of Gonzalez's use of syringe and Ms. Copley's approval of it. Both answered that they believed the syringe use was proper. Nurse Gonzalez learned of the other nurses' discussions and inquiries regarding her use of the syringe and filed a complaint with CCA charging the nurses, including Ms. Forrest, with harassment.

On July 29, 2005, Ms. Copley talked to Ms. Forrest, informed her of the complaint, and instructed her to not talk to anyone about the incident or to retaliate against anyone because of the complaint. Following this meeting, on the same day, Ms. Forrest talked to one of the other nurses — one who, with Ms. Forrest, had been accused of harassment by Nurse Gonzalez — about the incident in an effort to find out who had informed Ms. Copley about her conduct in the matter. Ms. Copley learned of Ms. Forrest's conversation in violation of her instruction, met with Ms. Forrest on August 2, 2005, and issued a written disciplinary notice to her for defying her instruction not to discuss the matter. Immediately after leaving this meeting with Ms. Copley, Ms. Forrest again confronted the same nurse she had previously confronted in another attempt to discover who had informed on her. Ms. Copley learned of this conversation, verified it with the confronted nurse the next day, and issued a second written disciplinary notice on August 4, 2004 with the recommendation that Ms. Forrest be terminated.[3] The recommendation

---

[3] It is not clear whether a second meeting occurred at this time or Ms. Forrest was given this second notice before her termination.

4

was approved and Ms. Forrest was terminated at a meeting that occurred on August 9, 2005. The termination letter that she was given from the Jail's Warden stated that her employment was being terminated "due to disobeying a direct order from your supervisor and making retaliatory statements to a co-worker . . . ."

On August 30, 2005, the EEOC dismissed Ms. Forrest's complaint and issued a right-to-sue notice. Sometime after she was terminated, Ms. Forrest filed a second complaint with the EEOC that included the new charge of retaliation. The EEOC dismissed that complaint as well and issued a right-to-sue notice.

Ms. Forrest invoked CCA's Employee Grievance Procedure regarding her termination with the result that the termination was reduced to a final warning. CCA reinstated her on September 26, 2005 with an award of back pay and benefits, but she did not return to work at that time because she allegedly was suffering from severe emotional distress as a result of her termination.

On November 30, 2005, Ms. Forrest filed the present suit and returned to work on December 5, 2005. There is no dispute that she exhausted her administrative remedies through the EEOC or that she timely filed the present suit.

The operative First Amended Complaint (doc. no. 11) asserts three counts of discrimination — one each for race, gender, and age discrimination — and a fourth count of retaliation. She claims that CCA's decision not to give her the pharmacy-technician assignment and its institution of the shift-rotation policy were discriminatory, in violation of her rights under 42 U.S.C. § 2000e-2(a) (race and gender discrimination) and 29 U.S.C. § 623(a) (age

5

discrimination).  She does not claim that her termination was discriminatory; instead, she claims only that it was retaliation for her EEOC complaints, in violation of her rights under 42 U.S.C. § 2000e-3(a) (gender and race retaliation) and 29 U.S.C. § 623(d) (age-based retaliation).  She brings this civil action pursuant to 42 U.S.C. § 2000e-5(f) (race and gender) and 29 U.S.C. § 626(c) (age) and seeks compensatory damages (for lost wages and benefits, emotional distress, loss of prestige, impaired opportunities for advancement, *etc.*), assignment to the pharmacy-technician duty, expungement of all disciplinary documents based on discriminatory actions, punitive damages, prejudgment interest, and attorney's fees and costs.

Discrimination and retaliation claims can be defended before trial by either direct evidence of discrimination or the *McDonnell Douglas* burden-shifting analysis.[4]  Ms. Forrest relies on *McDonnell Douglas* to defend against CCA's summary-judgment challenge.  This analysis requires that she first prove a *prima facie* case of discrimination by showing that (1) she is a member of a protected class, (2) she was meeting CCA's legitimate expectations, (3) she suffered an adverse employment action, and (4) she was treated less favorably than a similarly-situated employee who is not a member of her protected class.  If Ms. Forrest establishes all elements of her *prima facie* case, then the burden shifts to CCA to articulate a legitimate, non-discriminatory reason for its adverse employment action.  If CCA does so, then the burden returns to Ms. Forrest to show, by specific evidence, that CCA's stated reasons for its actions are merely pretexts to cover for illegal discrimination.  Pretext may be shown by evidence that CCA's proffered reasons are factually baseless; were not its actual reasons, *i.e.*, it did not believe

---

[4] The *McDonnell Douglas* analysis applies to retaliation claims.  *Mannie v. Potter*, 394 F.3d 977, 983 (7th Cir. 2005).

the reasons at the time; or they were insufficient to motivate its actions. *Burks v. Wisconsin Dept. of Transportation*, 464 F.3d 744, 754-55 (7th Cir. 2006); *Moser v. Indiana Dept. of Correction*, 406 F.3d 895, 900 (7th Cir. 2005); *Jordan v. City of Gary*, 396 F.3d 825, 833 (7th Cir. 2005); *Sartor v. Spherion Corp.*, 388 F.3d 275, 279 (7th Cir. 2004); *Traylor v. Brown*, 295 F.3d 783, 788 (7th Cir. 2002); *Jordan v. Summers*, 205 F.3d 337, 343 (7th Cir. 2000); *Testerman v. EDS Technical Products Corp.*, 98 F.3d 297, 303 (7th Cir. 1996).

### Pharmacy technician duty assignment

CCA contends that Ms. Forrest cannot prevail on her burden to prove a *prima facie* case that CCA refused to assigned her as the Physician Technician on account of her gender, race, and/or age because she cannot show **(1)** that she met CCA's legitimate expectations, or intentions, for the assignment; **(2)** that failure to obtain the assignment was an adverse employment action; and **(3)** that she was similarly situated to the nurse that got the assignment. CCA also argues that it has shown non-pretextual, non-discriminatory reasons for not giving the assignment to Ms. Forrest.

CCA contends that Ms. Forrest did not meet its legitimate expectations, or intentions, for the pharmacy-technician assignment for two reasons. First, she immediately undid part of the changes that the visiting pharmacy technician made to the pharmacy in preparation for the accreditation audit, which angered Ms. Garner at the same time that she was creating the new duty assignment and deciding which nurse to assign. Second, Ms. Forrest admitted that she could not perform all of the duties in the assignment's job description.

Ms. Forrest first responded with explanations of why her reorganization of the pharmacy

was justified and should not have angered Ms. Garner.  Specifically, Ms. Forrest alleges that **(1)** the visiting technician told her that she could make changes because what works at the technician's home facility might not work at the Jail; **(2)** Ms. Forrest reorganized only the overstock medications by putting them in alphabetical order which made them more easily and efficiently accessible by the nurses, and by storing them in "totes" according to previous Jail practice; **(3)** she immediately returned the medications to the original order once she was told to do so; **(4)** she received no written or oral discipline for her actions; and **(5)** when the assigned nurse began work in the pharmacy, he also reorganized parts of it, without receiving any discipline.  Ms. Forrest does not dispute that her changes angered Ms. Garner or that she acted without instructions.  Instead, her argument is that CCA's expectation for the pharmacy-technician assignment — or, from another viewpoint, Ms. Garner's angry reaction to her reorganization of the medications — was not legitimate either because her reorganization of the pharmacy medications made better sense than the way the visiting technician had originally organized them or because her brief reorganization, which the visiting nurse had invited and which Ms. Forrest immediately reversed when directed to, reasonably should not have angered Ms. Garner to the extent to find her unsuitable for the assignment.

The second reason CCA contends that Ms. Forrest was unsuitable for the assignment is that she admitted, when shown a list of the tasks for the assignment during her deposition, that she could not perform all of the tasks required for the assignment as pharmacy technician.  Ms. Forrest responded that her response was taken out of context because the list was compiled four months after the assignment was created and she was responding to being shown a list of the tasks for both the pharmacy technician and the pharmacy nurse.

Ms. Forrest has presented sufficient evidence and inferences to create a genuine issue about whether she was meeting CCA's legitimate expectations or intentions for the pharmacy-technician assignment. Resolution of the issue depends upon determining whether the extent of Ms. Garner's reaction to Ms. Forrest's reorganization of the pharmacy medications was legitimate and interpreting the meaning of Ms. Forrest's testimony about her capacity to perform the tasks required of the pharmacy technician. These are findings and evaluations reserved for the fact-finder.

CCA's next attack on Ms. Forrest's *prima facie* case is that she cannot show that she was similarly-situated to the nurse that received the pharmacy-technician assignment because he had threatened to quit if he did not receive a new assignment. Ms. Forrest does not dispute that there was a conflict between this nurse and a co-worker; that he had complained to his supervisors about it; or that he had threatened to quit if he was not reassigned off the second shift and away from the problematic co-worker. Ms. Forrest argues that CCA's standard of "similarly situated" is too narrow; that the nurse's threat to quit was a minor, not a material, difference between them; and that, at most, this difference presents a jury question about the comparability of their situations. Neither side presented any authority, controlling or persuasive, on the question of whether an employee's threat to quit alone distinguishes him enough from another employee to render them not similarly-situated under the *McDonnell Douglas* analysis. It is a close question. Based on this uncertain legal context and our conclusion that the effect of the nurse's threat to quit is better addressed later in the analysis, we conclude that Ms. Forrest has shown that she and the pharmacy-technician nurse were similarly situated.

Next, CCA argues that Ms. Forrest cannot establish a *prima facie* case because she

9

suffered no adverse employment action. An adverse employment action is an action that materially alters the terms or conditions of an employee's employment. *Stutler v. Illinois Dept. of Corrections*, 263 F.3d 698, 703 (7th Cir. 2001) (an adverse employment action is one that effects a significant change in the employee's status "such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits"). CCA argues that, because the pharmacy-technician assignment carried no additional pay or benefits and consisted of duties that previously all of the shift nurses had shared, it was not a promotion; thus, Ms. Forrest's failure to get the assignment was not an adverse employment action. Ms. Forrest, however, consistently refers to the assignment as a "promotion" that she was denied. To support her characterization, she points to some working conditions of the pharmacy-technician assignment that she contends were more advantageous compared to the regular nurses' duties: (1) the pharmacy technician has a single duty assignment, while the general shift nurses have many duty assignments; (2) the pharmacy technician works only on the first shift;[5] (3) there is less lifting, pushing, pulling, and walking; and (4) there is less inmate interaction.

There is no dispute that the terms and conditions of Ms. Forrest's job were not altered after she was passed-over for the pharmacy-technician assignment. Nothing was taken away from her; her job was not made more onerous or difficult in any manner. In fact, her share of the pharmacy duties that all of the nurses previously performed was assumed by the new pharmacy

---

[5] This was not a condition that existed at the time the pharmacy-technician assignment was created and filled because the shift-rotation schedule was not implemented until approximately three months later. Therefore, it does not factor into our analysis of CCA's assignment decision.

technician. Therefore, CCA's decision not to give her the technician assignment was an adverse employment action only if the assignment can be characterized as a promotion. It cannot be so characterized. The assignment carried no additional pay or benefits and there is no allegation or indication that it conferred an enhanced opportunity for advancement or any other employment benefit or advantage. Although Ms. Forrest lists four working conditions of the assignment that she contends are better than that experienced by the general nurses, she does not explain or show why these four conditions should be considered better or, if better, that they are materially better such that they justify characterizing the assignment as a promotion.

Neither side presented any authorities addressing under what circumstances better working conditions alone convert a lateral assignment into a promotion. Because the pharmacy-technician assignment enjoyed no additional pay, benefits, advancement opportunities, or authority; carried no substantively different (though fewer) duties or responsibilities than those previously performed by the general nurses; and it has not been shown that the working conditions were materially more advantageous than those experienced by general nurses, we conclude that the technician assignment was not a promotion. Therefore, the rejection of Ms. Forrest for the assignment was not an adverse employment action and she cannot establish this element of her *prima facie* case.

CCA asserted three non-discriminatory reasons why Ms. Forrest was not given the pharmacy-technician assignment. First, as mentioned above, the nurse who received the assignment had threatened to quit if he were not moved from the second shift and away from a problematic co-worker. Because CCA wanted to keep the nurse as an employee, it created the pharmacy-technician assignment specifically for him. Ms. Forrest does not dispute these facts.

11

Second, CCA believed that Ms. Forrest was the nurse who worked best "on the floor" with the doctor and it wanted to keep her available for that duty. Ms. Forrest also does not dispute this fact. Third, at the same time that she was planning for the new pharmacy-technician assignment, Ms. Garner, an African-American woman, was angered that Ms. Forrest began to rearrange the pharmacy medications immediately after Ms. Garner's visiting nurse had shaped-up the pharmacy in preparation for the Jail's accreditation audit. On the face of it, these are legitimate, non-discriminatory reasons for not giving Ms. Forrest the assignment.

Ms. Forrest's only argument that these reasons are merely pretexts for discrimination is that "she was given three (3) distinct and conflicting reasons why she was not given the position." (Plaintiff's Response (doc. no. 53), p. 17). Those reasons are basically the same as given by CCA: (1) Ms. Forrest's direct supervisor told her that the position was created specifically for the other nurse because he was threatening to quit; (2) Ms. Garner told Ms. Forrest that she was not given the assignment because Ms. Garner thought that Ms. Forrest would be better "on the floor" with the doctor; and (3) in its motion for summary judgment, CCA contends that Ms. Forrest did not meet CCA's legitimate expectations for the assignment. (*Id.*, pp. 17-18). Ms. Forrest does not explain why she believes that these reasons are conflicting; she simply concludes that "[t]hese three (3) conflicting reasons given by Defendant create an inference of pretext and a question for a jury to determine which one of Defendant's proffered reasons is the true reason why Plaintiff was not awarded the position." (*Id.*, p. 18).

The reasons do not conflict, however. It is obvious that there may be multiple reasons for a single employment decision. Ms. Forrest does not allege or show that any of the statements of reasons made to her included a representation that it was the exclusive reason and they are not

mutually exclusive. All three reasons consistently could have factored into management's deliberations regarding to whom to give the new assignment and CCA contends that they all did factor into the decision. Because the only basis for Ms. Forrest's claim of pretext is this supposed conflict among CCA's proffered reasons, we conclude that it is insufficient and must fail.

Because Ms. Forrest cannot show that she suffered an adverse employment action when she was not given the pharmacy-technician assignment, she is unable to make a *prima facie* case that CCA's decision was a result of gender, race, or age discrimination. In addition, Ms. Forrest failed to show that CCA's articulated legitimate non-discriminatory reasons for its decision are merely pretexts for discrimination. Therefore, under the *McDonnell Douglas* burden-shifting analysis, Ms. Forrest cannot demonstrate a genuine issue of material fact that she was discriminated against and CCA is due judgment as a matter of law against Ms. Forrest's claim of discrimination based on CCA's decision not to give the pharmacy-technician assignment to her.

### Shift rotation

CCA argues that Ms. Forrest cannot prove a *prima facie* case that it discriminated against her when it implemented the shift-rotation schedules for the nursing staff because shift rotations are not adverse employment actions and she was not treated differently than other similarly-situated employees not of her protected classes. These arguments merit only brief discussion because CCA's precedents are clear and Ms. Forrest offers insubstantial responses.

The Court of Appeals for the Seventh Circuit has clearly held that a change in shift assignment, with no other detriment to the employee, in, *e.g.*, pay, benefits, responsibilities, or

title, is not an adverse employment action, *Griffin v. Potter*, 356 F.3d 824, 829 (7th Cir. 2004); *Grube v. Lau Industries, Inc.*, 257 F.3d 723, 728 (7th Cir. 2001), and we have adhered to this precedent, *Hardy v. Floyd Memorial Hospital*, Cause no. NA 00-182-C B/S, *Entry on Defendant's Motion for Summary Judgment*, 2002 WL 24455, *4-6, 2002 U.S. Dist. LEXIS 261 (S.D. Ind., Jan. 2, 2002), *affirmed*, 55 Fed. Appx. 367, 2002 U.S. App. LEXIS 26772 (7th Cir. 2002). Ms. Forrest does not dispute this authority but only alleges that CCA's removing her from permanent assignment on the "preferred" or "coveted" first-shift assignment was, in fact, accompanied by a significant detriment because it made it more difficult for her to spend time with her family. However, whether employment actions are deemed adverse is determined by how they affect the terms or conditions of an employee's employment, not the conditions of her personal life or her subjective expectations. *Griffin*, 356 F.3d at 829; *Caples v. Media One Express of Illinois, Inc.*, Cause no. 00 CV 3736, *Memorandum Opinion and Order*, 2001 WL 1188882, *3-4, 2001 U.S. Dist. LEXIS 15820 (N.D. Ill., Oct. 3, 2001). Ms. Forrest cannot prove this element of her *prima facie* case.

There is no dispute that CCA's new shift-rotation plan, by which all nurses rotated shifts on a monthly basis and the roster of nurses on each shift was mixed, applied to all of the nurses,[6] not just to Ms. Forrest. Her argument that she was treated differently than other similarly-situated white nurses is somewhat obscure but appears to be based on the fact that most of the nurses on the "preferred" first shift were African-Americans:

> . . . Plaintiff has established that similarly situated Caucasian nurses were not required to change shifts in May 2005. Defendant argues that Plaintiff cannot

---

[6] The one exception was the newly-assigned Pharmacy Technician who worked only on the first shift.

> establish the fourth element of her *prima facie* case on this point because "the shift rotation policy affected all nurses regardless of race . . . ." However, the undisputed testimony of Plaintiff establishes that all but one of the "seven or eight" nurses that worked on the first shift were black. Half of these black nurses, including Plaintiff, were required to work either second or third shift following the implementation of the shift rotation policy. White nurses from the second and third shifts were permitted to work first shift during the rotation. Therefore, Plaintiff's deposition testimony makes clear that the shift rotation policy had an [*sic*] disparate impact on black nurses, and as such, Plaintiff has satisfied the fourth prong of her *prima facie* case.

(Plaintiff's Response, p. 15 (citations omitted)). It appears that Ms. Forrest's argument is that, because three or four of the first-shift African-American nurses were moved to other shifts during the first month of rotation, May 2005, and were replaced on the first shift with Caucasian nurses from the second and third shifts on their rotations, that there was a disparate impact on these African-American nurses. But she does not dispute that *all* nurses, African-American and Caucasian, were rotated monthly among the first, second, and third shifts pursuant to the new schedule. No nurses are permanently assigned to a particular shift. If her complaint is only about the effect of the shift changes on her during the initial month of May 2005, then certainly that is not a significant-enough impact on the terms or conditions of her employment to amount to discrimination. In addition, because Ms. Garner's plan was not only to rotate shifts but to mix the roster of nurses on each shift as well, it is expected that some nurses might not be reassigned in the initial month, but would be rotated in the next and subsequent months. This does not indicate discriminatory motives. Moreover, because Ms. Forrest alleges that "half" of the African-American nurses were rotated out of the first shift in May 2005, this means that half of the first-shift African-American nurses remained on the first shift in May 2005. Therefore, there was not a disparate impact on the first-shift African-American nurses for that month.

Ms. Forrest cannot establish the essential elements of her *prima facie* case that she

suffered an adverse employment action and that she was treated differently than similarly-situated employees not of her protected classes. Therefore, under the *McDonnell Douglas* burden-shifting analysis, Ms. Forrest cannot demonstrate a genuine issue of material fact that she was discriminated against and CCA is due judgment as a matter of law against Ms. Forrest's claim of discrimination based on CCA's implementation of shift rotation for its nurses.[7]

## Retaliation

Ms. Forrest claims that CCA's termination of her was retaliation for her filing an EEOC complaint about the pharmacy-technician assignment and the shift rotation policy. CCA argues that Ms. Forrest claim fails under the *McDonnell Douglas* analysis because CCA has articulated a non-discriminatory reason for her termination: insubordination; she deliberately disobeyed two orders not to talk to anyone about the syringe incident.[8] Ms. Forrest does not dispute any of the facts about the incident. However, to demonstrate that CCA's asserted reason for termination was pretextual, Ms. Forrest points to the following allegations: **(1)** she did not "understand" Ms. Copley's instructions to prohibit her from speaking with the nurse she twice confronted because both he and another nurse "were accused of harassment and spoke[n] to by Copley as well," (Response, p. 24); **(2)** CCA suffered no harm from her disobedience because

---

[7] Because this finding resolves Ms. Forrest's claim, we offer no comment on CCA's stated non-discriminatory reasons for the shift rotation or Ms. Forrest's argument that those reasons are mere pretexts for discrimination.

[8] Part of Ms. Forrest's response addresses whether her termination for harassing the Pharmacy Technician nurse that she twice confronted in violation of Ms. Copley's orders was discriminatory; but, despite giving these surrounding facts about the incident, CCA's only alleged and argued ground for Ms. Forrest's termination is insubordination. It does not rely on Ms. Forrest's harassment of either Nurse Gonzalez, who used the questioned syringe and complained about harassment, or the Pharmacy Technician as grounds for her termination.

the confronted nurse also had been accused of harassment; **(3)** Ms. Forrest had received no written discipline during her six years of employment with CCA prior to filing her EEOC complaint; and **(4)** her termination came soon after she filed her EEOC complaint.

Ms. Forrest does not dispute that Ms. Copley's two instructions to her to not talk with anyone about the syringe incident did not include an exception for the other two nurses identified in the harassment complaint, one of whom was the nurse she twice confronted. Ms. Forrest's personal and unilateral assumption that Ms. Copley's instruction did not apply to him does not tend to show that CCA's conclusion that she was insubordinate was a pretext. Moreover, her argument about her private "understanding" does not excuse her second confrontation of the nurse which occurred immediately after Ms. Copley disciplined her precisely for talking to the nurse in violation of her order and she was given a second order to remain silent and to not take any retaliatory action against anyone. She could not have entertained any reasonable doubt about the scope of Ms. Copley's instructions, especially after the second warning.

Regarding Ms. Forrest's second showing of pretext, she offers no explanation why the fact that the nurse she confronted was also included in the harassment complaint means that CCA "suffered no harm" from her disobedience. The undisputed evidence is that the harassment that Nurse Gonzalez reported took the form of other nurses talking about and investigating her practices and CCA wanted to both stop the alleged harassment and prevent any retaliatory conduct regarding the complaint. There is nothing unreasonable in these purposes. That Ms. Forrest continued to talk about the incident and twice confronted the pharmacy technician in an effort to find out who was informing on her violated both of CCA's purposes and constituted the very harms that it was seeking to avoid.

Ms. Forrest's record of no written disciplinary reports until her termination is insufficient to show pretext without additional information that CCA knew that she and/or other nurses committed similar violations of direct instructions during her six years of employment but declined to issue discipline. On the evidence presented, the July and August incidents were Ms. Forrest's first such disobedience and, therefore, do not tend to show pretext.

Ms. Forrest filed her EEOC complaint on May 27, 2005; her disobedience of Ms. Copley's instructions occurred on July 29 and August 2, 2005; and she was terminated effective August 9, 2005. Her first written discipline, therefore, was issued two months after she filed her EEOC complaint. CCA cites controlling precedent that a two-month delay between protected conduct and incurring an adverse action is too long to indicate pretext, *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 665 (7th Cir. 2006); *Bilow v. Much Shelist Freed Denenberg Ament & Rubenstein, P.C.*, 277 F.3d 882 (7th Cir. 2001), and that proximity alone is usually insufficient to show pretext, *Moser v. Indiana Dept. of Correction*, 406 F.3d 895, 905 (7th Cir. 2005) ("suspicious timing alone rarely is sufficient to create a triable issue"); *Sauzek v. Exxon Coal USA, Inc.*, 202 F.3d 913, 918 (7th Cir. 2000). With nothing else to indicate that CCA's otherwise reasonable and non-discriminatory grounds for terminating Ms. Forrest were pretextual, the two-month interval between the filing of her EEOC complaint and her discipline and eventual termination fails to support a pretext argument.

Ms. Forrest has not shown that CCA's articulated non-discriminatory reasons for terminating her were merely pretexts for discrimination. Therefore, under the *McDonnell Douglas* burden-shifting analysis, Ms. Forrest cannot demonstrate a genuine issue of material fact that CCA's termination of her was in retaliation for filing her EEOC complaints and CCA is

due judgment as a matter of law against Ms. Forrest's claim of retaliation.

## Conclusion

Because Plaintiff cannot demonstrate a genuine issue of fact that is material to her claims and Defendant is due judgment as a matter of law, the Court concludes that summary judgment should be awarded to Defendant and against Plaintiff on all of her claims that Defendant discriminated against her on the basis of her gender, race, and age and retaliated against her for filing an EEOC complaint. Defendant's motion is **GRANTED**.

Date: 01/07/2008

_____
SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:

John T. L. Koenig
BARNES & THORNBURG, LLP
jkoenig@btlaw.com

Denise K. LaRue
HASKIN LAUTER & LARUE
dlarue@hlllaw.com

Allan A. Wasson
HASKIN LAUTER & LARUE
allanwasson@comcast.net